**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **ALBERTO OSUNA SANCHEZ,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: _____** |
| | ) | |
| **NATIONAL COLLEGIATE ATHLETIC** | ) | |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

---

Comes now Plaintiff Alberto Osuna Sanchez ("Osuna") and files this Verified Complaint for Damages and Injunctive Relief against Defendant the National Collegiate Athletic Association ("NCAA"), and for his causes of action against the NCAA states as follows:

## I.      NATURE OF CASE

1.      Osuna brings this action to enjoin the NCAA from arbitrarily enforcing certain NCAA Bylaws against him that would prohibit him from playing a fourth year of Division I baseball due to his time spent playing baseball at a two-year junior college ("JUCO"), on the grounds that enforcement of such Bylaws violates Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, among other claims, and would cause substantial and irreparable harm to Osuna.

## II.      PARTIES AND JURISDICTION

2.      Osuna is a college baseball player. He currently resides in Knoxville, Tennessee. Osuna played baseball for two years at a junior college before enrolling at UNC Chapel Hill, an NCAA Division I institution.  He played three years of Division I baseball at UNC Chapel Hill, where he was a standout player.  He is now a member of the University of Tennessee Knoxville ("UTK") baseball team, where he seeks to play a fourth year of Division I baseball.

3. The NCAA is an unincorporated, member-led organization that acts as the governing body for collegiate athletics. The NCAA is made up of over 1,100 member institutions, divided into Division I, Division II, and Division III schools. Over 350 of the NCAA member institutions are Division I schools, including UTK.

4. This Court has jurisdiction over this action pursuant to 15 U.S.C. § 4, 15 U.S.C. § 15, 15 USC § 26, and 28 U.S.C. §§ 1331 and 1337.

5. This Court may exercise personal jurisdiction over the NCAA because the NCAA currently transacts business in the Eastern District of Tennessee. The NCAA and its member institutions, including UTK, conduct sports competitions, ticket and merchandise sales and other revenue-generating activities in the Eastern District of Tennessee.

6. Venue is proper in this district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391.

### III. FACTUAL BACKGROUND

#### A. The NCAA

7. The NCAA sets the rules and regulations that member institutions and athletes must follow on and off the field. If a collegiate institution wants to participate in the highest level of collegiate athletics (Division I), it must maintain membership with the NCAA and abide by the NCAA rules and regulations. If an athlete wants to participate in Division I athletics, the athlete must enroll at an NCAA member institution and comply with the NCAA rules and regulations. The NCAA regulates and controls Division I athletics through the Bylaws published in its Division I Manual ("Bylaws"), a copy of which is attached hereto as **Exhibit 1.**

8. The NCAA was created to act in the best interest of student athletes. The NCAA's main priority is to coordinate and deliver safe, fair and inclusive competition directly and by member institutions. However, the NCAA profits substantially off the services of its athletes. The

2

NCAA generated nearly $1.3 billion in revenue for 2022-2023 through various media rights and marketing deals tied to its championship athletic events.[1]

9.      Although the NCAA considers junior colleges to be "collegiate institutions" for purposes of determining an athlete's eligibility, it does not govern or control junior college athletics.  Junior college athletics are governed primarily by the National Junior College Athletic Association ("NJCAA"), which has no affiliation with the NCAA.

**B.      Name, Image, and Likeness Compensation**

10.     In 2021, the U.S. Supreme Court held in *Nat'l Collegiate Athletic Ass'n* v. *Alston,* 141 S. Ct. 2141 (2021), that the NCAA's rules and restrictions on compensating college athletes are subject to the Sherman Act and affirmed a decision invaliding one of those rules.

11.     Following *Alston*, the NCAA has permitted college athletes to earn money on the use of their name, image and likeness ("NIL").

12.     While athletes in all NCAA Divisions are permitted to earn NIL compensation, the reality is that most NIL money is earned by Division I athletes and there are no meaningful NIL opportunities for JUCO players.  Osuna's first opportunity to earn NIL compensation was while playing Division I baseball.

13.     Even among Division I athletic teams, NIL compensation can vary greatly.  It is estimated that the average NIL spending in Atlantic Coast Conference ("ACC") baseball teams

---

[1] *NCAA generates nearly $1.3 billion in revenue for 2022-2023,* Associated Press (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23

6594569.1

was half that of Southeastern Conference ("SEC") baseball teams, with SEC teams spending an average of $820,000-$920,000 per year.[2]

14.     In addition, as part of a recent NCAA settlement, Division I schools will be allowed to share athletic department revenue with their varsity athletes beginning in the 2025-2026 academic year.  Based on NCAA financial reporting, each member of the UTK baseball team would stand to earn approximately $20,500 in revenue sharing.[3]

## C.     The Labor Market

15.     As the Supreme Court has recognized, the NCAA "controls the market for college athletes." *Alston*, 141 S. Ct. at 2167 (Kavanaugh, J., concurring).  In the Division I sports labor market, athletes compete for spots on individual team rosters in their specific sport.  The process for obtaining a spot on a Division I athletic team is highly competitive.  The NCAA estimates that more than eight million athletes play a high school sport, while only 530,000 of those will compete as NCAA athletes in any Division.  According to the NCAA's statistics, less than 2.5% of high school baseball players will compete in Division I baseball.[4]

16.     Division I institutions compete against each other in recruiting top talent by offering various benefits, such as scholarships, access to top tier training facilities and coaching staffs, medical treatment, opportunities to compete at the highest collegiate level, exposure to scouts and other recruiters, nationwide publicity, and the opportunity to negotiate marketing deals and earn

---

[2] *College World Series might offer glimpse of future with only SEC and ACC teams in field,* Associated Press (June 11, 2024), https://apnews.com/article/college-world-series-acc-sec-de3184e15cd2f5ad879626097f084629

[3] *NCAA Revenue Sharing & NIL Estimates 2025, NCAA Revenue Sharing-Baseball Teams,* NCAA, https://nil-ncaa.com/baseball/

[4] *Estimated probability of competing in college athletics,* NCAA (April 1, 2024), https://www.ncaa.org/sports/2015/3/2/estimated-probability-of-competing-in-college-athletics.aspx

NIL compensation. The NCAA recognizes that JUCO transfers are an important part of the Division I sports labor market, noting that "every year hundreds of talented JUCO players transfer to NCAA Division I four-year colleges around the country looking to make an impact."[5]

17. The relevant geographic market is the United States. The NCAA and its Division I member institutions are located and compete nationwide.

18. There are no alternatives to the NIL opportunities or other resources and benefits Division I athletes receive from participating in Division I athletics. The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power. The NCAA fully controls and dictates the rules and regulations for participation in Division I athletics, and athletes who wish to participate in Division I athletics have no choice but to comply. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield financial revenue for the member institutions.

### D. The Five-Year Eligibility Rule

19. Bylaws 12.8 and 12.8.1 state that, "a student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport" and must complete "all seasons of participation in all sports within … five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." Pursuant to Bylaw 12.8.1.1, the five-year eligibility clock begins to run

---

[5] *College baseball's top 50 impact JUCO transfer hitters*, NCAA (Dec. 4, 2024), https://www.ncaa.com/news/baseball/article/2024-12-04/college-baseballs-top-50-impact-juco-transfer-hitters

from the date an athlete registers as a full-time student and attends the first day of class at any "collegiate institution," regardless of whether the institution is an NCAA member and regardless of whether or not the athlete participates in any sports.

20.     For athletes who competed during Spring 2020 athletic seasons, the NCAA granted them a blanket waiver, disregarding their 2020 season of competition due to COVID-19 and allowing them six academic years to complete five years of eligibility.[6]

21.     Pursuant to Bylaw 12.8, an athlete could attend a non-member junior college for one year without playing any sports, but that athlete's eligibility clock for Division I athletics has started, while another athlete could play a year of baseball at a post-secondary prep school with no repercussions as to eligibility, because his or her eligibility clock has not yet started.

### E.     The Intercollegiate Competition Rule

22.     Bylaw 12.02.6 states that, "intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution … represents the institution in any contest against outside competition … competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution … or competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition."

23.     Pursuant to Bylaw 12.02.6, intercollegiate competition includes athletic competition at a two-year junior college, even though the competition, resources, benefits and NIL opportunities are not equivalent to those available to Division I athletes, and even though athletes

---

[6] *2021 NCAA Division I COVID-19 Question and Answer Guide* (July 30, 2021), NCAA https://ncaaorg.s3.amazonaws.com/compliance/d1/D1GOV_COVID-19QAGuide.pdf

6594569.1

competing in other competitions, such as prep-school competitions, are not charged any Division I eligibility.

## F.     Definition of Collegiate Institution

24.     Bylaw 14.02.4 defines a "collegiate institution" to include an institution of higher education that is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree or that conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree.

25.     Thus, junior colleges fall within the definition of a "collegiate institution" even though they are not an NCAA member institution.

## G.     Osuna's Competition in Collegiate Baseball

26.     Osuna enrolled at Walters State Community College ("WSCC"), a two-year junior college, in the Fall of 2019. He competed on the WSCC baseball team during the Spring 2020 season, which was cut short due to COVID-19. Due to the NCAA's COVID-19 relief for athletes competing in the Spring of 2020, Osuna's Spring 2020 baseball season did not count as a year of NCAA eligibility.

27.     Osuna remained enrolled at WSCC the following year and competed on the WSCC team during the Spring 2021 season, where he was named the NJCAA DI Player of the Year. Under the Bylaws, Osuna's 2021 JUCO year counts as a year of NCAA eligibility, leaving him with only three years of Division I eligibility.

28.     Osuna graduated from WSCC in the Spring of 2021 with an associate's degree in exercise and sports science.

29.     Osuna then enrolled at UNC Chapel Hill ("UNC") in the Fall of 2021.  UNC is a member of the ACC and a Division I institution for men's baseball.  Osuna played baseball at UNC for the Spring 2022, Spring 2023 and Spring 2024 seasons, using three years of his Division I eligibility.  While at UNC, he hit a total of 45 home runs. He entered the Spring 2023 season as a Preseason All American.  During his Spring 2024 season, he batted .281 with 14 home runs and 56 RBIs, and competed in the College World Series.

30.     While at UNC, a Division I institution, Osuna had the opportunity to earn, and did in fact earn, NIL compensation.

31.     Osuna graduated from UNC in Spring 2024 with a bachelor's degree in exercise and sport science.   He was not selected for the 2024 MLB draft.

32.     After graduating from UNC, Osuna enrolled in a post-graduate program at the University of Tampa in the Fall of 2024 to pursue a degree in entrepreneurship.  Osuna was a member of the University of Tampa Division II baseball team in the Fall of 2024.  Osuna would have preferred to play a fourth year of Division I baseball given the higher level of competition, opportunity to increase his NIL marketability and earnings, nationwide exposure, and other benefits and resources available to Division I athletes.  But, Osuna believed that he was ineligible for a fourth year of Division I baseball, due to the NCAA's Bylaws that penalize him for playing a year of JUCO baseball.

**H.     U.S. District Court Enjoins the NCAA From Enforcing Bylaws Against Deigo Pavia**

33.     In November 2024, Diego Pavia, the starting quarterback for Vanderbilt University, filed a complaint for injunctive relief in the Middle District of Tennessee, seeking to enjoin the NCAA from enforcing the same Bylaws at issue in this case, which would have counted Pavia's year of JUCO football as a year of NCAA eligibility, leaving him with only three years of Division

I eligibility instead of four. *Pavia v. NCAA*, No. 3:24-cv-01336, 2024 U.S. Dist. LEXIS 228736 (M.D. Tenn. Dec. 18, 2024).

34. On December 18, 2024, the U.S. District Court for the Middle District of Tennessee issued a preliminary injunction enjoining the NCAA from enforcing Bylaw 12.02.6 against Pavia, permitting Pavia to compete in a fourth year of Division I football. The court opined that Pavia was likely to succeed on the merits of his claim that the NCAA's enforcement of the Bylaws requiring JUCO years to be counted as NCAA Division I eligibility years violates the Sherman Act, and that Pavia would suffer immediate and irreparable harm if not granted injunctive relief.

I. **NCAA Issues Blanket Waiver Allowing Athletes with JUCO Years to Compete in 2025-2026 Academic Year**

35. Following the *Pavia* decision, the NCAA Division I Board of Directors issued a blanket waiver in December 2024 providing certain former-JUCO athletes with a fourth year of Division I eligibility ("Blanket Waiver"). Specifically, athletes with JUCO years who used their third year of Division I eligibility in 2024-2025 were permitted to compete in a fourth year of Division I sports during the 2025-2026 season. A copy of the Blanket Waiver announcement is attached hereto as **Exhibit 2.**

36. Although Pavia and Osuna have identical collegiate eligibility records (one year disregarded for COVID-19, one JUCO year, and three Division I years), the NCAA's Blanket Waiver does not, on its face, extend relief to Osuna. Unlike football, collegiate baseball is played in the Spring. Therefore, Osuna must use his fourth year of Division I eligibility during the Spring 2025 baseball season. Because the NCAA Blanket Waiver extends eligibility only to athletes using their fourth year of Division I eligibility for Fall 2025 or Spring 2026 seasons, Osuna is not covered by the waiver. This arbitrary distinction harms Osuna and is another example of the NCAA's unlawful restrictions on the market for Division I athletics.

9

**J.      Osuna's Waiver Request**

37.     Following the *Pavia* decision and the NCAA's issuance of a Blanket Waiver to similarly situated athletes, Osuna sought guidance and clarification from the NCAA regarding his remaining Division I eligibility.  Like Pavia, Osuna had used one year of JUCO eligibility and three years of Division I eligibility.   Thus, like Pavia, Osuna should be eligible to compete in Division I athletics for a fourth year.   However, after more than one attempt to get an answer to his question, the NCAA ultimately told Osuna that a waiver request would have to be filed if he wanted an answer regarding his eligibly for Division I athletics.   Waiver requests must be submitted by member institutions.

38.     Because his situation is nearly identical to that of Pavia, Osuna believed he would be eligible to play a fourth year of Division I baseball.  Osuna decided to enter the transfer portal on January 13, 2025 because he wanted the opportunity to play at the highest competitive level, access to other benefits and resources that are available to Division I athletes, such as top tier coaching and training staff and nationwide publicity, and the opportunity to increase his marketability and earn NIL compensation.   At the time he left the University of Tampa, he had a 3.8 GPA.

39.     UTK began recruiting Osuna on January 14, 2025.  UTK is a Division I institution in the powerhouse SEC.  UTK's baseball team is the defending DI National Champions and Coach Vitello was named the 2024 National Baseball Coach of the Year. The NIL opportunities and resources available to Osuna at UTK are better than those available to him at other non-Division I institutions.  Osuna committed to UTK and applied for admission in late January 2025.   After being admitted, Osuna enrolled in classes full-time.  Osuna arrived in Knoxville, Tennessee on or

about February 1, 2025.  Osuna has already received an NIL opportunity that exceeds any NIL opportunities he has previously had.

40.     As instructed by the NCAA, UTK promptly submitted a waiver request to the NCAA on behalf of Osuna on February 3, 2025.  The waiver requested that Osuna's year of JUCO baseball not count toward his four years of NCAA Division I baseball eligibility for the same reasons that Pavia's year of JUCO football did not count toward his four years of Division I football eligibility.  A copy of the waiver request is attached hereto as **Exhibit 3**.

41.     As of February 11, 2025, eight days after the waiver request was filed, the NCAA had not yet assigned a representative to Osuna's case.   The NCAA has yet to issue a decision on Osuna's waiver request.

42.     Given the urgency of Osuna's situation, he could not wait any longer for the NCAA to issue a decision on his waiver request. UT's Spring 2025 baseball season opens on February 14, 2025.  The UT baseball roster must be finalized by midnight on February 13, 2025.

43.     Given the lack of guidance and inaction by the NCAA, Osuna is now passed the time during which he could have enrolled in another institution for the Spring 2025 term.

K.     **NCAA Bylaws Violate the Sherman Act**

44.     The Bylaws enforced by the NCAA are adopted through member institutions and the Division I council and constitute horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I athletes.

45.     The Bylaws at issue in this case violate Section 1 of the Sherman Act by restraining the free market for NCAA Division I athletics by precluding Osuna and other similarly situated athletes who enrolled in junior colleges from earning NIL compensation, accessing top tier resources, and gaining valuable exposure at the highest level of competition while playing four

years of Division I athletics. The Bylaws restrain certain college athletes who transfer from a junior college from taking advantage of four years of Division I eligibility, while affording that freedom to other athletes who enroll at Division 1 institutions as freshmen. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and member institutions.

46.    The Five-Year Rule violates the Sherman Act by starting each athlete's eligibility clock while the athlete is attending a non-NCAA institution where they lack access to the resources and benefits of Division I schools and are effectively unable to earn NIL compensation. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the JUCO level (where little to no NIL is available) as reasonably commensurate with the opportunities and benefits available while playing NCAA Division I athletics.

47.    Without application of these anticompetitive Bylaws, there would be high demand for the services of Osuna and other similarly situated athletes, as demonstrated by the fact that UT recruited Osuna one day after he entered the transfer portal.

48.    The Bylaws disproportionately harm JUCO and former JUCO athletes in the Division I athletics market because the eligibility restraints force them to make decisions about whether to attend a junior college, whether to participate in sports while attending a junior college, whether to obtain a degree from a junior college, or whether to transfer to an NCAA Division I institution.

49.    The Bylaws harm athletes when they are making these decisions because attending a junior college limits the athlete's possibility of Division I eligibility to three years. The Bylaws further harm athletes by making them choose between foregoing playing a sport while attending junior college, which still starts the athlete's eligibility clock, or limiting athletic participation to

one year in an effort to preserve the full extent of their already reduced three years of Division I eligibility. If these athletes choose to participate in sports and stay at a junior college long enough to obtain their two-year degree, their Division I eligibility will be further reduced to two years. Other Division I athletes do not faces these restrictions.

50. If the NCAA is permitted to enforce these anticompetitive Bylaws against Osuna, Osuna will suffer immediate and irreparable harm. The lost opportunity that comes with missing a Division I college baseball season cannot be remedied with monetary damages only. Not only will Osuna's future potential NIL earnings suffer, but he will be denied the intangible benefits of competing at the Division I level, such as a year of developing his game under top tier coaching and training staff, the nationwide exposure of playing SEC baseball for the defending National Champions, and increased draft prospects.

**L. The Rule of Restitution**

51. If the Court grants Osuna the injunctive relief to which he is entitled, the Court should also enjoin the application of Bylaw 12.11.4.2, which permits the NCAA to provide "restitution" in the event the Court's injunctive order prohibiting the enforcement of Bylaw 12.02.6 against Osuna is vacated, stayed, reversed or otherwise determined to be not justified. Under Bylaw 12.11.4.2, restitution can include, but is not limited to, vacating athlete and member institution records, postseason bans, and financial penalties. Granting Osuna injunctive relief, while simultaneously permitting the NCAA to punish and/or retaliate him and/or UTK for acting in accordance with the Court's order would be inconsistent.

## IV. CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

52. Osuna incorporates the factual allegations above as if fully set forth herein.

13

53.     The NCAA effectively controls the labor market for Division I athletics and enjoys monopsony power in the market for Division I athletics.

54.     The NCAA's actions as described herein have unreasonably restrained competition in the market for Division I athletics.

55.     The NCAA has entered into unlawful horizontal agreements with its member institutions to restrain competition in the relevant market through adoption and enforcement of the anticompetitive Bylaws cited herein.  Specifically, the NCAA has unlawfully restrained the ability of Division I college athletes who transfer to the NCAA from a non-NCAA institution to play Division I athletics for the same number of years offered to other college athletes.

56.     The NCAA's actions are a *per se* violation of Section I of the Sherman Act. Alternatively, the NCCA's enforcement of the Bylaws at issue constitute an unreasonable restraint of trade that cannot withstand analysis under the rule of reason framework.  The rule of reason framework can be conducted with a "quick look" or "twinkling of the eye" in this case. *Alston*, 594 U.S. 69, 81 (citing *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla*., 468 U.S. 85, 110 n.39 (1984)).

57.     The market for Division I athletic services, in which each athletic competes for roster spots in their respective sport, is the relevant antitrust market. The transactions between the NCAA and NCAA member institutions and the college athletes in this market are commercial in nature and covered by the Sherman Act.

58.     The NCAA's actions have unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as Division I institutions are prohibited from retaining the services of a JUCO transfer, like Osuna, for the full four years they are permitted to retain the services of other college athletes. This limitation disadvantages JUCO players seeking

to transfer to an NCAA Division I institution along with former JUCO players currently playing for an NCAA Division I institution and prevents such players from realizing the benefits of competing in NCAA Division 1 athletics for the same length of time available to all other college players, harming their current and future earning potential.

59.     Additionally, the NCAA has arbitrarily and capriciously applied the Bylaws in such a manner as to unreasonably and irreparably harm Osuna by granting certain former JUCO athletes a fourth year of Division I eligibility through its Blanket Waiver while simultaneously denying the same to Osuna without any justifiable reason.

60.     The NCAA's and its member institutions' anticompetitive actions were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

61.     The NCAA Bylaws restricting Osuna's eligibility are not procompetitive, and any benefits they provide are far outweighed by the harm to competition and to the college athletes who are subject to the Bylaws.

62.     Moreover, the Bylaws can be modified to impose less restrictive alternatives to accomplish any procompetitive goals the NCAA may allege. Reasonable and less restrictive alternatives available to the NCAA's current Bylaw enforcement practices, include, but are not limited to: (1) starting a college athlete's eligibility clock when the athlete enrolls in classes at "an NCAA member institution" rather than a two-year collegiate institution; (2) defining "intercollegiate competition" to include competition as part of "an NCAA member institution" as opposed to as part of a two-year collegiate institution; (3) allowing athletes to compete in five

seasons of eligibility during their eligibility clock – an alternative which the NCAA is allegedly already considering. [7]

63.   Additionally, rationale, consistent, unbiased and transparent application of its Bylaws and waivers, but individual and blanket, would allow for a more reasonable and less restrictive alternative to the NCAA's current anticompetitive practices.

64.   As a direct result of the NCAA's unlawful conduct, Osuna has suffered and will continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the NCAA Bylaws.

65.   The NCAA's conduct in seeking to enforce its anticompetitive Bylaws is ongoing and will continue to cause irreparable harm to Osuna unless injunctive relief is granted. This ongoing harm has caused, and continues to cause, direct harm to Osuna by restricting his ability to increase his market worth and earn NIL compensation, limiting his future opportunities to showcase his skills and talent for MLB personnel, denying him the opportunity to develop his talent while having access to top tier coaching, facilities and resources, denying him the opportunity to play collegiate games at the highest level as a member of a championship-winning SEC team, and does so as an unreasonable restraint on the labor markets for Division I athletics. Additionally, the time for Osuna to transfer to another institution has expired, so if the NCAA is not enjoined from preventing Osuna from using a fourth year of Division I eligibility, Osuna will have no opportunity to play collegiate baseball.

66.   Osuna asks for a temporary restraining order, preliminary injunction, and permanent injunction enjoining the NCAA from continuing to violate Section 1 of the Sherman

---

[7] NCAA considering allowing five years of eligibility for players in all sports, CBS Sports, https://collegehoopstoday.net/rothstein-files/ncaa-considering-allowing-five-years-of-eligibility-for-players-in-all-sports/

Act by enforcing NCAA Bylaws 12.8 and 12.02.6, as to Osuna, and from enforcing NCAA Bylaw 12.11.4.2 to punish Osuna and/or UTK for actions taken in compliance with any orders from this Court. Osuna also asks the Court to explicitly rule that he is entitled to play Division I college baseball at UTK for the Spring 2025 season.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

67. Osuna incorporates the factual allegations above as if fully set forth herein.

68. As an enrolled student at UTK and a member of UTK's baseball team, Osuna has a business relationship with UTK that would be of pecuniary value to Osuna.

69. As part of that business relationship, Osuna is entitled and expected to participate on UTK's baseball team.

70. The NCAA is aware of this relationship.

71. Through improper means and with improper motive, the NCAA has tortiously interfered with this relationship by arbitrarily and capriciously refusing to grant Osuna a waiver to which he is entitled and by enforcing unlawful anticompetitive Bylaws that interfere with Osuna's rights in the labor market.

72. As a direct result of the NCAA's conduct, Osuna is being prohibited from competing on UTK's baseball team, which would be of pecuniary value to Osuna.

73. The NCAA's interference with Osuna's relationship with UTK has caused and will continue to cause Osuna to suffer irreparable harm and monetary damages.

74. Accordingly, Osuna is entitled to injunctive relief and monetary damages.

## COUNT III
## BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

75. Osuna incorporates the factual allegations above as if fully set forth herein.

17

76. Osuna is party to a valid and enforceable agreement with the NCAA. In exchange for being a member of an NCAA Division I sports team, Osuna has no choice but to comply with the NCAA Bylaws and regulations which the NCAA imposes.

77. The NCAA has breached its contractual obligations to Osuna by seeking to enforce unlawful, anticompetitive Bylaws against Osuna which interferes with his rights in the labor market.

78. The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing that it owes to Osuna.

79. By seeking to enforce unlawful, anticompetitive Bylaws against Osuna and by arbitrarily excluding Osuna from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has breached the implied covenant of good faith and fair dealing owed to Osuna.

80. The NCAA's unlawful conduct has caused and will continue to cause Osuna to suffer irreparable harm and monetary damages.

81. Accordingly, Osuna is entitled to injunctive relief and monetary damages.

## COUNT IV
## BREACH OF CONTRACT AND BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – THIRD PARTY BENEFICIARY

82. Osuna incorporates the factual allegations above as if fully set forth herein.

83. The NCAA is made up of member institutions and operates through valid and enforceable agreements with its member institutions. Through these agreements, the NCAA agrees to provide member institutions with the opportunity to compete in Division I sports and, in return, the member institutions agree to abide by the rules and regulations adopted, interpreted and enforced by the NCAA.

84.     Division I athletes are the intended third-party beneficiaries of these agreements, as the NCAA publicizes that its priority is to provide "a world-class athletics and academic experience for student-athletes that fosters lifelong well-being" and to "coordinate and deliver safe, fair and inclusive competition directly and by Association members."[8]

85.     Division I athletes were specifically contemplated as third-party beneficiaries of the agreements between the NCAA and its member institutions at the time the agreements were made.

86.     The NCAA has breached its obligations to the third-party beneficiaries by seeking to enforce unlawful, anticompetitive Bylaws which interfere with the rights of student athletes and Division I institutions in the labor market.

87.     The NCAA also has a duty to carry out its contractual obligations in a manner that is fair and reasonable and consistent with the implied obligation of good faith and fair dealing.

88.     By seeking to enforce unlawful, anticompetitive Bylaws against athletes and member institutions and by arbitrarily excluding Osuna, a third-party beneficiary, from a blanket eligibility waiver provided to other similarly situated former JUCO athletes, the NCAA has breached the implied covenant of good faith and fair dealing.

89.     As a third-party beneficiary who has and will continue to suffer irreparable harm and monetary damages as a result of the NCAA's actions, Osuna has standing to bring this claim.

90.     Accordingly, Osuna is entitled to injunctive relief and monetary damages.

**PRAYER FOR RELIEF**

WHEREFORE, Osuna respectfully prays that this Court:

---

[8]     *Mission and Priorities*, NCAA, https://www.ncaa.org/sports/2021/6/28/mission-and-priorities.aspx#:~:text=Provide%20world%2Dclass%20services%20to,improves%20health%2C%20safety%20and%20performance.

1.      Adjudge and decree that the NCAA's enforcement of NCAA Bylaws 12.8 and 12.02.6 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.      Enter a temporary restraining order restraining the NCAA from enforcing Bylaws 12.8 and 12.02.6 against Osuna and from enforcing Bylaw 12.11.4.2 against Osuna and/or UTK for actions taken in compliance with any orders from this Court and declaring Osuna eligible to compete in Division I baseball for the Spring 2025 season;

3.      Enter a preliminary injunction enjoining the NCAA from enforcing Bylaws 12.8 and 12.02.6 against Osuna and from enforcing Bylaw 12.11.4.2 against Osuna and/or UTK for actions taken in compliance with any orders from this Court and declaring Osuna eligible to compete in Division I baseball for the Spring 2025 season;

4.      Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining the NCAA from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8 and 12.02.6 as to Osuna, and from enforcing Bylaw 12.11.4.2 against Osuna and/or UTK for actions taken in compliance with any orders from this Court and declaring Osuna eligible to compete in Division I baseball for the Spring 2025 season;

5.      Award Osuna monetary damages in an amount to be determined at trial;

6.      Award Osuna his costs, including reasonable attorneys' fees, including treble damages, pursuant to 15 U.S.C. § 15;

7.      Osuna demands a jury to hear all claims set forth herein for which he has the right to demand a jury; and

8.      Award Osuna any other relief that this Court deems just and proper.

6594569.1

Respectfully submitted this 12th day of February, 2025.

**WOOLF, McCLANE, BRIGHT**
**ALLEN & CARPENTER, PLLC**

*s/ Chad Hatmaker*
J. Chadwick Hatmaker (BPR # 018693)
Kaitlyn E. Hutcherson (BPR # 035188)
Post Office Box 900
Knoxville, TN 37901
(865) 215-1000
chatmaker@wmbac.com
khutcherson@wmbac.com

*Attorneys for Plaintiff Alberto Osuna Sanchez*

6594569.1

# VERIFICATION

Pursuant to Fed. R. Civ. P. 65 and 28 U.S.C. § 1756, I, Alberto Osuna Sanchez, the

Plaintiff in the above-captioned matter, declare that the foregoing facts alleged in the Verified

Complaint are true and correct to the best of my knowledge, information, and belief.

_____
Alberto Osuna Sanchez