# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | |
|---|---|
| **ALBERTO OSUNA SANCHEZ,** | **Case No. 3:25-CV-00062-CEA-DCP** |
| *Plaintiff,* | |
| v. | **JUDGE ATCHLEY** |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | **MAGISTRATE JUDGE POPLIN** |
| *Defendant.* | |

## NOTICE OF FILING OF SUPPLEMENTAL AUTHORITY

Defendant National Collegiate Athletic Association files this Notice of Supplemental Authority in support of its opposition to Plaintiff Alberto Sanchez Osuna's Motion for Preliminary Injunction. On February 28, 2025, in a case pending before the Middle District of Georgia addressing identical issues to those pending before this Court, the district court denied plaintiff's motion for preliminary injunction. That Order is attached hereto as **Exhibit 1**.

Respectfully submitted,

*s/ Taylor J. Askew*
Taylor J. Askew (BPR 033193)
(admitted *pro hac vice*)
David J. Zeitlin (BPR 037664)
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
T: (615) 244-6380
F: (615) 244-6804
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

*Counsel for Defendant*
*National Collegiate Athletic Association*

## CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2025, I electronically filed the foregoing Response to Plaintiff's Motion For Preliminary Injunction with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties and counsel of record.

Dated: February 28, 2025

By: *s/ Taylor J. Askew*

Taylor J. Askew
Holland & Knight LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
david.zeitlin@hklaw.com

*Counsel for National Collegiate Athletic Association*

#517147323_v9

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ATHENS DIVISION

| | |
|---|---|
| **DYLAN JAMES GOLDSTEIN,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** <br> **3:25-cv-00027-TES** |
| **NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,** | |
| *Defendant.* | |

## ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

There's no automatic right to a preliminary injunction—the sought-after remedy before the Court.[1] In the Eleventh Circuit, preliminary injunctions are extraordinary and drastic remedies awarded on the balance of a potential, and usually fast-approaching injury, and the effect of what happens if a preliminary injunction does or doesn't issue.[2] And, no matter how sympathetic a party's cause may be, the Court cannot grant this extraordinary remedy unless that party meets the high bar set by the Eleventh Circuit's relevant binding precedent.

---

[1] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

[2] *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998); *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987) ("In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.").

A.    <u>**Background**</u>

Here, Dylan Goldstein,[3] a student at the University of Georgia, is not currently eligible to play for the Bulldogs in the Spring 2025 National Collegiate Athletic Association ("NCAA") baseball season because he has already exhausted his four years of eligibility allowed under current NCAA eligibility rules. Unless a court intervenes, he will continue to be ineligible to play. [Doc. 10-3, Fisher Decl., p. 4 ¶ 14, p. 5 ¶ 20]. Wanting to play one more season, Goldstein seeks a preliminary injunction to enjoin the NCAA from enforcing certain bylaws against him that prevent him from playing baseball for the University of Georgia in the 2025 season. [Doc. 10, p. 1]. These bylaws state:

> **12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport[.] An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:
>
> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. . . .

[Doc. 11-4, p. 23]. To put it in simple terms, NCAA eligibility rules allow student-

---

[3] No one disputes that Goldstein is an exceptionally talented baseball player and has enjoyed a stellar college baseball career. [Doc. 10-3, Fisher Decl., p. 3 ¶ 7]; [Doc. 17, p. 1].

athletes like Goldstein to play no more than four seasons within a five-year period, and any year during which Goldstein took the field at any "collegiate institution," including a junior college, counts. [*Id.*].

In Spring 2020, Goldstein began his college baseball career at Chipola College, a junior college ("JUCO") in Marianna, Florida. [Doc. 11, p. 11 ¶ 13]. While at Chipola College, he participated in two JUCO seasons (Spring 2020 and Spring 2021) before enrolling at Florida Atlantic University (an NCAA Division I institution) for two seasons (Spring 2022 and Spring 2023). [*Id.*]. However, due to the COVID-19 pandemic, the 2020 college baseball season was canceled and did not count against Goldstein's eligibility. [*Id.* at p. 11 ¶ 13; p. 18 ¶ 31; p. 20 ¶ 37]. Then, in 2023, he transferred to the University of Georgia (also a Division I institution) and played one season for the Bulldogs in Spring 2024. [*Id.* at pp. 11–12 ¶ 13; pp. 20–22 ¶¶ 37–41]. So, doing some quick math—one season disregarded for COVID-19, one JUCO year, and three Division I seasons—Goldstein's eligibility to play college baseball expired when the Dawgs' 2024 season ended on June 10, 2024. [*Id.* at p. 23 ¶ 45].

According to Goldstein's Verified Complaint [Doc. 11], "the NCAA Division I Board of Directors issued a blanket waiver" on December 23, 2024, "providing certain former-JUCO athletes with a fourth year of Division I eligibility[.]" [*Id.* at p. 23 ¶¶ 43–45]. Goldstein alleges that the waiver permits student-athletes with JUCO years who used their third year of Division I eligibility in 2024-2025 to compete in a fourth year of

Division I sports during the 2025-2026 season. [*Id.*]. But, because he expended his eligibility in the 2023-2024 academic year, he wasn't covered by that waiver and now asks the Court to grant him a preliminary injunction that revives his eligibility by essentially expanding the NCAA's waiver to include him. [*Id.* at p. 23, ¶ 45]; *see* n.5, *infra*.

To reiterate, the waiver only extends to student-athletes who are going to use their fourth year of Division I eligibility for the Fall 2025 and Spring 2026 seasons. [Doc. 11, p. 23, ¶ 45]. Thus, the fact that the waiver *excludes* Goldstein (for the current Spring 2025 season) gives rise to his argument that its draftsmanship presents an "arbitrary and anti-competitive" harm and that the bylaws at issue in this case create an "unlawful restriction on the market for Division I athletics" in violation of Section 1 the Sherman Antitrust Act. 15 U.S.C. § 1; [Doc. 11 p. 23 ¶ 45; pp. 26–28 ¶¶ 54–59]; [Doc. 10-1, p. 2].[4]

**B.    Procedural History**

Goldstein filed this lawsuit against the NCAA on February 18, 2025, and understanding the urgency of his suit, given the start of the 2025 baseball season, the Court held a hearing on his Motion for Temporary Restraining Order ("TRO") [Doc. 10] the very next day. Eager to get this case rolling, Goldstein, his lawyer, and counsel for the NCAA were all able to make it to the Court's hearing held in Macon, Georgia. [Doc.

---

[4] Goldstein offered no case law that provides that "arbitrary" decisions or "arbitrary" harms violate the Sherman Antitrust Act. The Court understands Goldstein's argument to be that any "arbitrary" decision that has the requisite anticompetitive effect would run afoul of the antitrust laws.

4

16]. As you can expect, the Court heard arguments from Goldstein that it should grant his request for a TRO so that he could immediately play baseball for the 2025 season. Then, the Court, of course, heard arguments from the NCAA that Goldstein had not met the relative burden to receive a TRO against it.

From the bench, the Court orally denied Goldstein's request for a TRO[5] but stressed that it would not let this case "dillydally," recognizing—and somewhat sympathizing with—the "tough spot" in which Goldstein finds himself.[6] [Transcript of Proceedings, p. 62:15–16; p. 63:1]. In setting the hearing with respect to Goldstein's request for a preliminary injunction, the Court informed the parties that it "would be as flexible as [it] can possibly be." [*Id.* at p. 63:14]. Once Goldstein and the NCAA agreed to schedule the preliminary injunction hearing for 5:00 P.M. on Tuesday, February 25, 2025, the Court did just that.[7] [*Id.* at p. 63:17–24; p. 65:10–16]; [Doc. 16]. That, of course,

---

[5] TROs under Rule 65 "function[] to preserve the status quo until a court can enter a decision on a preliminary injunction application, while a Rule 65 preliminary injunction is often used to maintain the status quo until a court can enter a final decision granting a permanent injunction or some other final relief." *United States v. DBB, Inc.*, 180 F.3d 1277, 1282 n.5 (11th Cir. 1999). Not unlike Goldstein's request for a TRO, his request for a preliminary injunction, if granted, "would effectively deem him eligible to immediately play baseball [and] would undoubtedly flip the status quo[.]" [Doc. 17, p. 5 (quoting *Ludy v. Dozier*, No. 1:18-CV-165 (WLS), 2019 WL 13434824, at *1 (M.D. Ga. Oct. 25, 2019))].

[6] The Court also issued a written Order Denying Plaintiff's Motion for Temporary Restraining Order [Doc. 17] on February 20, 2025.

[7] Having submitted its Response [Doc. 15] opposing Goldstein's request for a TRO with less than 24 hours' notice, the NCAA asked for additional time to file a "more fulsome" brief. [Doc. 15, p. 1]. The Court told the NCAA that it could have until noon on Monday, February 24, 2025, to file another brief. [Transcript of Proceedings, pp. 65:22—66:5]. Likewise, the Court also informed Goldstein that he, too, could submit anything he wanted by that same deadline. [*Id.* at p. 66:1–5]. He opted to rest on his pleading and initial arguments filed with the Court on February 18, 2025.

shaped a quick turnaround—just six days—for Goldstein to gather his evidence to support his Motion for Preliminary Injunction [Doc. 10]. But, that's what he and the NCAA wanted and agreed to.[8]

### C.    Plaintiff's Motion for Preliminary Injunction

Obtaining a preliminary injunction is no small feat, and getting one involving alleged antitrust violations is even tougher. *See B & W Gas, Inc. v. Gen. Gac. Corp.*, 247 F. Supp. 339, 341 (N.D. Ga. 1965) ("[C]ourts are most cautious in granting injunctive decrees on anti-trust matters and the burden for preliminary relief is far greater than that imposed for ultimate relief before a jury."). In baseball terms, it's akin to hitting for the cycle—not impossible, but pretty darn rare. Neither Goldstein nor the NCAA dispute what is required in the Eleventh Circuit to obtain a preliminary injunction. Such relief may only be granted if the moving party clearly establishes the following requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018); *see also Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

---

[8] The Court informed the parties that it would be holding a jury trial in the Athens Division from February 24-26, 2025. In order to give Goldstein the hearing on his chosen day, the Court let the parties know that it would have to hold the hearing after the trial day concluded, hence, the untraditional 5:00 P.M. start time. The Court thanks the parties, its staff, and the security personnel for their flexibility and willingness to work late to get this important case heard.

During the Court's preliminary injunction hearing on February 25, 2025,

Goldstein urged the Court to rely on his Verified Complaint; his Declaration [Doc. 10-2];

and a Declaration [Doc. 10-3] submitted by his self-described agent, Randy Fisher, an

Indiana-based attorney who has represented more than one hundred professional and

collegiate athletes. [Doc. 10-3, Fisher Decl., p. 3 ¶ 5]; *see* n.7, *supra*. As he began to lay out

his case, Goldstein noted his sharp disagreement with the NCAA's written arguments

submitted in its more detailed Response [Doc. 21]—arguments that he "basically"

needed to prove his entire case at the hearing in order to obtain the requested

injunction. The NCAA, however, isn't wrong. He must, after all, *clearly* establish that

there's a substantial likelihood that he'll succeed on the merits of his Sherman Act

claim. *Keister*, 879 F.3d at 1287; *Siegel*, 234 F.3d at 1176. This just goes to show the heavy

burden Goldstein faces in seeking a preliminary injunction under antitrust laws. *See B &*

*W Gas, Inc.*, 247 F. Supp. at 341.

Goldstein's request for a preliminary injunction fails for two reasons: the bylaws

he challenges are non-commercial, eligibility rules that are not subject to the Sherman

Act, and even if those bylaws somehow are subject to antitrust scrutiny, he failed to

supply evidence of a sufficient or appropriate caliber for the Court to conduct the

requisite analysis.

1.    *National Collegiate Athletic Association v. Alston*

First, upon review of the applicable law, the Court finds that Goldstein is

unlikely to succeed on the merits of his claim under Section 1 the Sherman Antitrust Act, 15 U.S.C. § 1, because the eligibility bylaws he complains of are not commercial in nature and are, therefore, not subject to antitrust scrutiny.[9]

The Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. The Supreme Court has long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018)).

"Those who run th[e] enterprise" of collegiate athletics used to profit "in a very different way than the student-athletes whose activities they oversee." *Alston*, 594 U.S. at 80. That was, of course, until 2021 when the Supreme Court, in *National Collegiate Athletic Association v. Alston*, held that the NCAA violated antitrust laws by restricting the compensation and benefits that student-athletes could receive. 594 U.S. at 107 (Kavanaugh, J., concurring). Yes, *Alston* "drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness,"—commonly referred to as NIL—but the NCAA rules that limited

---

[9] With respect to his efforts to obtain a preliminary injunction, Goldstein noted that "[he's] just traveling on the Sherman Act claim[.]" *See* [Transcript of Proceedings, p. 36:22–24], *in connection with* Motion for Temporary Restraining Order and Preliminary Injunction [Doc. 10].

compensation of student-athletes "in an attempt to maintain amateurism across college sports" were indisputably commercial in nature. *Pavia v. Nat'l Collegiate Athletic Ass'n*, --- F. Supp. 3d ----, No. 3:24-cv-01336, 2024 WL 5159888, at *1 (M.D. Tenn. Dec. 18, 2024). Here, the NCAA bylaws Goldstein seeks to enjoin are not commercial rules, they are "true 'eligibility' rule[s]" because they "limit[] the number of years that student-athletes may play collegiate sports." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066 (9th Cir. 2015).

At the preliminary injunction hearing, Goldstein heralded the Supreme Court's decision in *Alston* as the proverbial nail in the coffin for the bylaws at issue in his case— one that essentially abrogates *O'Bannon* and effectively converts these targeted bylaws into a class of rules that are likewise commercial in nature. In the Court's view, though, *Alston* is more scalpel than ax.

Certainly, *Alston* eliminated the rules that once limited the compensation that student-athletes could receive in exchange for their athletic services. The Supreme Court, however, was just as clear that its decision concerned "only a narrow subset of the NCAA's *compensation rules*." 594 U.S. at 108 (Kavanaugh, J., concurring) (emphasis added). The "Seasons of Competition: Five-Year Rule" and the "Five-Year Rule" that Goldstein hopes to strike down, simply aren't commercial in nature despite his efforts to intertwine them with what he and his agent swear are "significant" opportunities to capitalize off his NIL. [Doc. 10-2, Goldstein Decl., p. 5 ¶ 25]; [Doc. 10-3, Fisher Decl., p. 4

¶ 14]. It goes without saying that not every rule a commercial enterprise like the NCAA makes is "commercial" in the antitrust sense. *Basett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 959 (6th Cir. 2004)) ("[T]he appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'").

In this Court's opinion, *Alston*, in addition to delivering the fatal blow to the NCAA's compensation rules, gave high praise to the district court's "thoughtful legal analysis consistent with established antitrust principles," 594 U.S. at 107—namely, its application of the rule-of-reason analysis with expert economic analyses on the respective markets. 594 U.S. at 81 ("Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a '[rule-of-reason] analysis.'"); *see also In re Nat'l Collegiate Athletic Ass'n Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067–68, 1079 (N.D. Cal. 2019). Indeed, *Alston* focused its review heavily on the district court's analysis of the NCAA's student-athlete *compensation rules* through an antitrust lens, it didn't touch the NCAA's bylaws that are "true 'eligibility' rule[s]" that "limit[] the number of years . . . student-athletes may play college sports." *See O'Bannon*, 802 F.3d at 1066. Thus, *Alston* doesn't have the far-reaching breadth Goldstein needs to acquire a preliminary injunction because the bylaws he seeks to enjoin are not subject to antitrust scrutiny. *See* [Doc. 21, pp. 15–17].

2.    **Rule-of-Reason Analysis**

Second, even if they were subject to such scrutiny, and the Court had to roll out a thorough and sifting rule-of-reason analysis, Goldstein failed to prove that the bylaws he challenges have a substantial anticompetitive effect. This analysis requires "a fact-specific assessment of market power and market structure to assess a challenged restraint's actual effect on competition." *Alston*, 594 U.S. at 81. In describing the rule-of-reason, the Supreme Court "has sometimes spoken of a three-step, burden-shifting framework as a means for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.* at 96 (quoting *Am. Express Co.*, 585 U.S. at 541) (alteration adopted). First, as just mentioned, Goldstein "has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Id.* Had Goldstein met that burden, then the NCAA would've had "to show a procompetitive rationale for the restraint." *Id.* And, if the NCAA could make that showing, the burden would have reverted to Goldstein "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 96–97.

As to his first burden, Goldstein needed to show that the NCAA's bylaws preventing him from playing college baseball in Spring 2025 have "a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.*, 529 U.S. at 541. Before courts can even begin to assess whether a challenged restraint

has an anticompetitive effect, the relevant market must first be defined. *Id.* at 542. Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 543. Here's where the six-day turnaround between the TRO hearing and the preliminary injunction hearing was of vital importance.

Defining the relative market requires "almost necessarily an expert assessment." *Clifton-Draper v. Pelam Int'l, Ltd.*, No. 8:10- CV-822-T-23AEP, 2013 WL 5596798, at *5 (M.D. Fla. Oct. 11, 2013). To that end, expert assessment ties directly into Goldstein's antitrust claim and his likelihood of success on the merits for that claim as it relates to his efforts to obtain a preliminary injunction. *See id.* Aside from his proffers discussed above—his Verified Complaint, his own declaration, and a declaration from his agent—Goldstein provided nothing by way of expert testimony or evidence to define the relative market. With "no specific facts or expert analysis supporting the existence of a relevant antitrust market for services of Division I baseball players," the NCAA argues that Goldstein failed to meet his first burden under a rule-of-reason analysis. [Doc. 21, p. 19]. The Court agrees.

While the NCAA bylaws that Goldstein challenges undeniably affect him, he has not alleged any facts or presented any evidence showing how they produce a market-wide impact. *See Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-CV-238, 2024 WL 4433307, at *5 (M.D.N.C. Oct. 7, 2024). Congress passed antitrust laws for "the

protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962). "That is, the 'anticompetitive effects' are measured by their impact on the market rather than by their impact on [individuals]." *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071–72 (11th Cir. 2004) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002) ("To have an 'anticompetitive effect,' conduct 'must harm the competitive process and thereby harm consumers[.] [H]arm to one or many competitors will not suffice.'")).

Yes, the Court is mindful that Goldstein's pleading in this case is verified, and as such, may be used and considered as evidence supporting injunctive relief, but its contents do not rise to the level of "expert assessment" required to define the relative market.[10] *Cf. Dunn v. Warden Ware State Prison*, 644 F. App'x 898, 900 (11th Cir. 2016); *see also Clifton-Draper*, 2013 WL 5596798, at *5. Similarly, the declarations submitted in support of Goldstein's preliminary injunction, without anything more, do not cure such a significant oversight. *See, e.g.*, [Doc. 10-2, Goldstein Decl.]; [Doc. 10-3, Fisher Decl.]; *see also* [Doc. 25]. His non-expert allegations are unsubstantiated by any expert assessment

---

[10] The record, as of the Court's hearing on Goldstein's preliminary injunction, did not have a single dollar amount on it with respect to Goldstein's current or potential NIL compensation. *See generally* [Doc. 10-2, Goldstein Decl.]; [Doc. 10-3, Fisher Decl.]. It wasn't until Goldstein began his arguments to the Court on February 25, 2025, that his attorney mentioned monthly NIL compensation in the amount of $3,000 and a term sheet for a *potential* $18,000 contract. Nothing further was presented to the Court. Nevertheless, as the NCAA pressed at the preliminary injunction hearing, arguments made by counsel, whether they be in a brief or during an oral argument, are not evidence. *See Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013); *Ayers v. Harrison*, 650 F. App'x 709, 722 (11th Cir. 2016) ("But the argument of counsel is not evidence.").

concerning what he speculates could be potential NIL earnings. This simply cannot satisfy Goldstein's first burden of a rule-of-reason analysis when it comes to defining his relative market. *See Wyndham Vacation Ownership, Inc. v. Montgomery Law Firm, LLC*, No. 8:19-cv-1895-CEH-CPT, 2021 WL 4948151, at *12 (M.D. Fla. Oct. 18, 2021); *see also Church of Scientology Flag Serv. Org. v. City of Clearwater*, 777 F.2d 598, 608 (11th Cir. 1985) (holding that a motion for preliminary injunction must be supported by evidence; a party is not entitled to preliminary injunctive relief "solely on the basis of its naked allegations"); *cf. Pavia*, 2024 WL 5159888, at *9 (citing 18-page report from a Ph.D.-holding economist "with expertise in the fields of business, industrial organization[,] and labor economics), Response of Joel G. Maxcy, *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-cv-01336 (M.D. Tenn. Dec. 2, 2024), ECF No. 33-1.

The record in this case undoubtedly prevents the Court from granting a preliminary injunction. Goldstein tendered no expert report, no economic analysis, or even a single exhibit that would allow the Court to conduct its required rule-of-reason analysis. Without any appropriate evidence of an antitrust injury—the type of injury that he must have—Goldstein cannot show a substantial likelihood of success on a Section 1 Sherman Antitrust Act claim. *See Wyndham Vacation Ownership*, 2021 WL 4948151, at *11 ("[A] party asserting claims under the antitrust laws must prove . . . that [he] has suffered an 'antitrust injury[.]'"); [Doc. 21, pp. 6–7]. Unable to show a substantial likelihood of success, our law precludes the Court from granting the relief

for which he understandably begs. *Keister*, 879 F.3d at 1287; *Siegel*, 234 F.3d 1176; [Doc. 23, p. 2 ¶ 7].

###    D.    Conclusion

To conclude, *O'Bannon* is still good law, and although it's not binding on this Court, it's persuasive enough for the Court to follow in the absence of Eleventh Circuit precedent on this delicate and novel antitrust issue. The NCAA's bylaws that "limit[] the number of years . . . student-athletes may play college sports" are "true 'eligibility' rule[s]." *O'Bannon*, 802 F.3d at 1066. Thus, the "Seasons of Competition: Five-Year Rule" and the "Five-Year Rule" are not commercial in nature, and the Sherman Act does not apply. Consequently, Goldstein does not have a likelihood of success on the merits of an antitrust claim, and he fails to meet his burden for what is vastly known as such extraordinary and drastic remedy. *McDonald's Corp.*, 147 F.3d at 1306. Goldstein's failure to meet the first step to obtain a preliminary injunction means that the Court need not wade into whether he faces a substantial threat of irreparable injury, whether there is any potential harm to the NCAA, or whether his requested relief raises any public-interest concerns.[11] *Keister*, 879 F.3d at 1287; *Siegel*, 234 F.3d at 1176.

---

[11] With respect to irreparable injury, the Court nevertheless notes a couple of points. Aside from the fact that Goldstein can't currently *play* baseball because of the NCAA's current bylaws, he hasn't been *eligible* to play collegiate baseball since June 10, 2024. As of that date, Goldstein had no eligibility remaining, and as he comes before the Court some eight months later, he still has none. The Court finds that because he has not had any remaining eligibility for more than eight months, that same lack of eligibility cannot now meet the irreparable harm requirement for the issuance of a preliminary injunction.

Accordingly, the Court **DENIES** Plaintiff Dylan Goldstein's Motion for

Preliminary Injunction [Doc. 10].

**SO ORDERED**, this 28th day of February, 2025.

<u>S/ Tilman E. Self, III</u>
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT COURT**

---

Further, Goldstein's harm doesn't become irreparable because of one district court's decision to extend a current (as opposed to former) player's eligibility or the resulting waiver that the NCAA issued in response to that decision. *See generally Pavia*, 2024 WL 5159888. The NCAA has the authority to set rules that define player eligibility such as requiring athletes to be enrolled students or to maintain a certain minimal academic standing to compete. *See Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring) ("Everyone agrees that the NCAA can require student athletes to be enrolled students in good standing."). And, the NCAA has the authority to issue a waiver that begins on a certain date. All eligibility rules will necessarily exclude a certain set of players, and those excluded players will undoubtedly find the eligibility rules unfair. But, that doesn't make the eligibility rules automatically illegal. While Goldstein argued that any—any—rule restricting a student from playing would violate antitrust laws, the Court just doesn't see it that way. Fortunately, the Court doesn't have to decide today if the NCAA can set basic eligibility rules such as limiting a student-athlete's playing career to only four seasons or requiring one to be a full-time student with a minimal grade point average without violating the Sherman Antitrust Act.