UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| ALBERTO OSUNA SANCHEZ, | ) | |
| *Plaintiff*, | ) | Case No. 3:25-cv-62 |
| v. | ) | Judge Atchley |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | Magistrate Judge Poplin |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Alberto Osuna Sanchez's ("Osuna") Motion for Preliminary Injunction [Doc. 2]. Plaintiff contends that some of Defendant National Collegiate Athletic Association's ("NCAA") eligibility bylaws violate Section 1 of the Sherman Antitrust Act. For the reasons explained below, Plaintiff's motion will be **DENIED**.

### I. FACTUAL BACKGROUND

Plaintiff Alberto Osuna Sanchez plays college baseball. His collegiate career began in the Spring of 2020 at Walters State, a junior college in Morristown, Tennessee. [Doc. 2-1 at ¶ 1]. Osuna enjoyed great success during his two years at Walters State. [*Id.*]. His first season was cut short due to COVID-19, but he earned player of the year honors in his second season and came one home run short of leading the league in that category. [*Id.*]. After the Spring 2021 season, Osuna took his talents to Division I and joined UNC Chapel Hill's baseball program. [*Id.* at ¶ 2]. Osuna played three seasons with the Tar Heels and continued his streak of success, hitting a total of 45 home runs and entering the 2023 season as a Preseason All American. [*Id.*].

After the Spring 2024 season concluded, Osuna wanted to play another year of Division I baseball. [Doc. 1 at ¶ 32]. The problem for Osuna? The NCAA's eligibility bylaws rendered him

ineligible to play a fourth year of Division I baseball. Osuna had only played three years of Division I baseball at UNC, but one of his two seasons at Walters State counted against his four total years of Division I eligibility.[1] The one season at Walters State counted against Osuna pursuant to NCAA Bylaw 12.02.6. That bylaw, when read alongside others, provides that an athlete's time spent competing at junior colleges counts against him when calculating his four years of Division I eligibility. [Doc. 3 at 4–5]. Thus, Osuna had exhausted his Division I eligibility based on his Spring 2021 season at Walters State and three seasons at UNC.

This reality led Osuna to enroll at the University of Tampa, a Division II institution, in the Fall of 2024. Before Osuna ever took the field in Tampa, however, an athlete who faced similar eligibility issues—Vanderbilt University Quarterback Diego Pavia—filed a lawsuit against the NCAA. Like Osuna, Pavia competed for two years at a junior college, with one of those years exempted due to COVID-19. *Pavia v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-cv-1336, 2024 WL 5159888, at *4 (M.D. Tenn. Dec. 18, 2024). Also like Osuna, Pavia then moved to Division I and played at that level for three seasons. *Id.* Pavia faced the same dilemma Osuna now faces: his junior college season and three Division I seasons combined to exhaust his four years of eligibility. *Id.* So he sued. Pavia argued that the very same bylaws Plaintiff challenges violate the Sherman Antitrust Act. *Id.* at *1. The court denied Pavia's request for a temporary restraining order but later granted him preliminary injunctive relief on December 18, 2024. *Id.*

Five days after the Middle District of Tennessee granted this injunctive relief, the NCAA issued a Blanket Waiver that allows former junior college athletes like Pavia to compete for a fourth year in Division I. [Doc. 1-2]. That Blanket Waiver does not apply to Osuna, however,

---

[1] Only Osuna's 2021 season at Walters State counts against him for Division I eligibility purposes. His 2020 season, cut short due to COVID-19, does not count against him based on the NCAA's decision to exclude that season from any athlete's eligibility calculation. [Doc. 3 at 5].

because it only covers athletes who will use this year of eligibility in the 2025–26 academic year. Osuna would use his year of eligibility in the 2024–25 academic year by playing this spring, so the Blanket Waiver is of no benefit to him. [Doc. 3 at 7]. Nonetheless, Osuna chose to enter the transfer portal and give Division I baseball another shot. [Doc. 2-1 at ¶ 4]. He officially entered the transfer portal on January 13, 2025, and committed to the University of Tennessee ("UT") later in the month. [*Id.*].

Given the Blanket Waiver's inapplicability to him, Osuna remained ineligible pursuant to the NCAA's rules. UT therefore submitted a waiver request to the NCAA on February 3, 2025, and asked that Osuna be permitted to play a fourth season of Division I baseball. [Doc. 2 at ¶ 3]. Despite several attempts to reach NCAA representatives, Plaintiff's counsel had not heard back as of February 11, 2025. [*Id.* at ¶ 4–6]. This lawsuit followed.

Plaintiff moved for a temporary restraining order on February 12, 2025. [Doc. 2]. With UT's baseball season set to begin on February 14, 2025, the Court conducted a hearing on February 13, 2025, and denied Plaintiff's motion that same day. [Doc. 15]. The Court established an expedited briefing schedule on Plaintiff's motion for a preliminary injunction and conducted a hearing on February 26, 2025. Plaintiff's motion for a preliminary injunction renews his initial request for relief: he asks the Court to enjoin the NCAA from enforcing Bylaw 12.02.6 against him and declare his eligibility for the Spring 2025 baseball season. [Doc. 17 at 25]. Plaintiff's motion is now ripe for the Court's review.

## II. STANDARD OF REVIEW

Preliminary injunctions are "extraordinary remedies." *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 715 F. Supp. 3d 1048, 1053 (E.D. Tenn. 2024) (citation omitted). They are typically designed "to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter*

3

*& Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). Courts consider four factors when determining whether to issue a preliminary injunction. Those factors include "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction." *Memphis A. Phillip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020).

## III. ANALYSIS

Plaintiff's primary claim is that NCAA Bylaw 12.02.6 (the "JUCO Rule") violates Section 1 of the Sherman Antitrust Act. A different NCAA Bylaw, commonly referred to as the Five-Year Rule, limits student-athletes to four seasons of "intercollegiate competition" over a five-year period. [Doc. 17 at 3]. The JUCO Rule then defines "intercollegiate competition" to include the seasons during which an athlete competes at a junior college. [*Id.* at 4]. In counting his competition time at junior colleges against his four years of Division I eligibility, the JUCO Rule, Plaintiff contends, runs afoul of the Sherman Act.

The Sherman Act outlaws "unreasonable restraints of trade." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). Plaintiff must prove two elements to succeed on his Sherman Act claim. First, he must show that Defendant NCAA "participated in an agreement." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). This element is not in dispute. The NCAA and its member institutions indisputably participate in an agreement to enforce NCAA Bylaws, including the JUCO Rule. *Tennessee*, 718 F. Supp. 3d at 761. Second, Plaintiff must establish that the NCAA's agreement has "unreasonably restrained trade in the relevant market." *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 718. This element provides the source of the parties' disagreement.

Following the Supreme Court's landmark decision in *Alston*, the NCAA's restraints on trade are reviewed under the rule of reason. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 96–97 (2021). The rule of reason analysis consists of three steps. First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect." *Id.* at 96. Second, once substantial anticompetitive effects are shown, the defendant must "show a procompetitive rationale for the restraint." *Id.* Third, the burden shifts back to the plaintiff, who must "demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 97. Because the limited record does not establish that the JUCO Rule has substantial anticompetitive effects, Plaintiff cannot demonstrate a strong likelihood of success on his Sherman Act claim, and his request for a preliminary injunction must be denied.

## A. The Challenged Rule's Commercial Status

Before working through the rule of reason analysis, the Court must answer a threshold question: is the JUCO Rule commercial in nature? This question must be answered first because Section 1 of the Sherman Act only applies to rules that are "commercial in nature." *Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). "The dispositive inquiry in this regard is whether the rule itself is commercial, not whether the entity promulgating the rule is commercial." *Id.* at 959. Accordingly, the Court must focus on the JUCO Rule's commercial status and not that of the broader NCAA.

Neither the Supreme Court nor the Sixth Circuit has declared that all NCAA eligibility rules are commercial. Quite the opposite. The Sixth Circuit's instruction to consider only "the rule itself" when conducting this analysis implies that some NCAA rules are not commercial. After all, it would make little sense to conduct a rule-by-rule analysis if all rules are commercial. Plaintiff takes a different view. He argues that after *Alston* opened the door for NIL compensation, NCAA

5

eligibility rules are necessarily commercial. [Doc. 17 at 10]. The theory is this: athletes can now earn NIL compensation, so rules that affect their eligibility—and consequently their access to the market for NIL compensation—are commercial in nature. Plaintiff is not alone in holding this view. Indeed, the *Pavia* court used the same logic to conclude that the JUCO Rule is commercial in nature. *Pavia*, 2024 WL 5159888, at *6 (holding that "restrictions on who is eligible to play and therefore to negotiate NIL agreements" qualify as commercial rules).

Put simply, Plaintiff's contention is that *Alston* changed the game. The Court agrees, at least to a certain extent. *Alston*, to be sure, paved the way for a massive market that provides compensation to college athletes for their name, image, and likeness. That is no small change from the pre-*Alston* world. As the Middle District of Georgia recently opined, however, *Alston* may be "more scalpel than ax." *Goldstein v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-27, Doc. 26 at 9 (M.D. Ga. Feb. 28, 2025). *Alston* involved a challenge to NCAA rules that restricted what "education-related benefits" colleges could provide as compensation to student-athletes. *Alston*, 594 U.S. at 74. Nothing in *Alston* states that all NCAA eligibility rules are commercial in nature. Justice Kavanaugh, albeit in a concurrence, took great care to emphasize that *Alston* "involves only a narrow subset of the NCAA's *compensation* rules." *Alston*, 594 U.S. at 108 (Kavanaugh, J., concurring) (emphasis added). He also noted the universal agreement "that the NCAA can require student athletes to be enrolled students in good standing." *Id.*

This language suggests that some distinctions could remain between the NCAA's eligibility rules and its obviously commercial rules, such as the compensation rules at issue in *Alston*. What's more, *Alston* did not invalidate the Sixth Circuit's rule-by-rule analysis it articulated in *Worldwide Basketball*, 388 F.3d at 959. Nor did *Alston* call into question the Ninth Circuit's decision in *O'Bannon*. *Goldstein*, Doc. 26 at 9, 15. There, the Ninth Circuit distinguished

between rules that "regulate what compensation NCAA schools may give student-athletes" and "true eligibility rules," such as "the rules limiting the number of years that student-athletes may play collegiate sports." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1066 (9th Cir. 2015). The former are commercial rules, but the latter are not. *Id.*

The Court is left with an uncertain and clearly evolving legal landscape. No binding precedent categorizes all NCAA eligibility rules as commercial in nature. Yet the NIL era, in many ways, blurs the lines between clearly commercial rules and those eligibility rules once thought to be explicitly non-commercial. Where are those lines drawn? It's difficult to say. If the JUCO Rule is commercial because it affects student-athletes' access to the NIL market, then wouldn't the same be true for all eligibility rules? Rules governing minimum GPA and credit hour requirements have the same effect. Like the JUCO Rule, those rules also affect an athlete's eligibility and access to the market for NIL compensation.

This logic gives the Court pause. Readily characterizing all eligibility rules as commercial, which is the logical end to Plaintiff's position, may overextend *Alston* and contravene the Sixth Circuit's instruction to consider only "the rule itself" when conducting this inquiry. But the Court can understand why the *Pavia* court and others, in response to the changing world of NIL, classified NCAA eligibility rules as commercial in nature. *Pavia*, 2024 WL 5159888, at *6; *but see Goldstein*, Doc. 26 at 8–9 (holding that the JUCO Rule and Five-Year Rule are not commercial). The Court does not need to resolve these tensions, however. Though a challenged restraint's commercial status is a threshold issue, Plaintiff's Sherman Act claim fails for an independent reason: he has not, at this stage, established that the JUCO Rule produces substantial anticompetitive effects. Accordingly, the Court will assume that the JUCO Rule is commercial and proceed to the rule of reason analysis.

### B. Substantial Anticompetitive Effects

The rule of reason's first step requires the plaintiff "to prove that the challenged restraint has a substantial anticompetitive effect." *Alston*, 594 U.S. at 69. Plaintiffs may prove substantial anticompetitive effects through direct or indirect evidence. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018). Relevant here, indirect evidence of substantial anticompetitive effects requires "proof of market power plus some evidence that the challenged restraint harms competition." *Id.*[2] The "amount of work needed" to assess a challenged restraint's anticompetitive effects "can vary." *Alston*, 594 U.S. at 88. The competitive effects of restraints at the opposite ends of the spectrum— that is, restraints that "so obviously" harm or do not harm competition—can be determined in "the twinkling of an eye" or only after "a quick look." *Id.* (citations and internal quotation marks omitted). Courts generally should not condemn challenged restraints until they have "amassed 'considerable experience with the type of restraint at issue' and 'can predict with confidence that it would be invalidated in all or almost all instances.'" *Id.* at 89 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007)).

In *Alston*, the Supreme Court affirmed a district court's decision to enjoin certain NCAA rules that, as discussed earlier, limited the education-related benefits athletes could receive in exchange for their athletic services. *Id.* at 107. Critically, *Alston* made its way to the Supreme Court after a ten-day bench trial and with a "voluminous record." *Id.* at 97. It was the "voluminous record" that led the district court to conclude that the relevant NCAA rules produced substantial anticompetitive effects. *Id.* at 97–98. The record in this case is far from voluminous. To the contrary, this lawsuit was filed just over two weeks ago, and the parties' evidence of the challenged

---

[2] Defendant does not appear to dispute that it holds market power, but it contends that Plaintiff fails to adequately define the relevant market and simply asks the Court to assume that Division I athletics constitutes the relevant market. [Doc. 20 at 13]. The Court does not need to address this argument, however, because Plaintiff has failed to establish substantial anticompetitive effects in any event. Thus, the Court will assume Division I athletics is the relevant market.

8

restraint's anticompetitive effects (or lack thereof) is mostly limited to brief declarations from two economists who offer vastly different views. This case's current posture and its largely undeveloped record causes the Court to question whether it can readily characterize the challenged restraint as anticompetitive after only a "quick look." Notwithstanding these concerns, the Court will consider Plaintiff's arguments.

Plaintiff advances three theories as to how the JUCO Rule produces substantial anticompetitive effects. He contends that the rule dissuades athletes from attending junior colleges, creates disadvantages for junior colleges in recruitment, and generates downstream effects that harm consumers. Start with the argument that the JUCO Rule induces athletes to attend Division I institutions. Because the JUCO Rule counts an athlete's time competing at a junior college against his four years of eligibility, Plaintiff's economic expert, Dr. Joel Maxcy, suggests that the JUCO Rule induces athletes to attend Division I institutions, even "when a JUCO school may be in their best interest, both academically and for development of their athletic potential." [Doc. 21-1 at ¶ 39]. In economic terms, the JUCO Rule "discounts" an athlete's choice to attend a junior college in lieu of a Division I school. [*Id.* at ¶ 36].

Perhaps Dr. Maxcy is right, but the Court is not convinced that it can conclude with only a "quick look" that the JUCO Rule produces substantial anticompetitive effects by driving athletes to Division I schools over junior colleges. Why is that? It's because athletes may, and likely do, decide to attend Division I schools in lieu of junior colleges for any number of reasons independent of the challenged JUCO Rule. *Arbolida v. Nat'l Collegiate Athletic Ass'n*, No. 2:25-cv-2079, Doc. 15 at 6 n.2 (D. Kan. Feb. 21, 2025) (noting that "there appears to be a reputational, resource, and monetary difference between JUCOs and Division I member institutions that makes them weak substitutes independent of the NCAA rules for eligibility"). Even Dr. Maxcy acknowledges that

9

Division I schools provide greater exposure and more NIL opportunities than junior colleges. [Doc. 21-1 at ¶ 36]. Plaintiff likewise acknowledges this difference in his declaration. [Doc. 2-1 at ¶ 8]. Considering the inherent advantages Division I institutions provide, the Court cannot conclude after only a "quick look" that the JUCO Rule "so obviously" produces anticompetitive effects by inducing athletes to ditch junior colleges in favor of Division I schools. *Alston*, 594 U.S. at 88.

Plaintiff urges that the JUCO Rule leads athletes to attend Division I schools instead of junior colleges on a market-wide scale. [Doc. 21 at 10]. This proof of harm to the market is necessary because "antitrust laws were enacted for 'the protection of *competition*, *not competitors*.'" *Nat'l Hockey League Players' Ass'n*, 325 F.3d at 720 (emphasis in original); *see also Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-238, 2024 WL 4433307, at *5–6 (M.D.N.C. Oct. 7, 2024) (refusing to enjoin NCAA rules limiting the acceptance of prize money in non-NCAA competitions because the plaintiff's evidence of anticompetitive harm pertained only to "a few elite 'consumers'"). To show that the JUCO Rule harms competition in the market, Plaintiff emphasizes that approximately 20% of Division I baseball players in 2023—representing 1,500 athletes—had transferred from a junior college. [Doc. 21 at 10]. That such a significant chunk of athletes stand to lose eligibility, in Plaintiff's view, underscores the JUCO Rule's far-reaching anticompetitive effects. [*Id.*]. Not necessarily. The 20% statistic Plaintiff cites could cut equally in the opposite direction. That 20% of college baseball athletes went to junior colleges before transferring to Division I schools could suggest that plenty of players were not dissuaded from initially attending junior colleges, notwithstanding the JUCO Rule's effect on eligibility.

Harm to individual athletes does not constitute Plaintiff's sole argument regarding anticompetitive effects. Instead, Plaintiff also asserts that the JUCO Rule provides competitive advantages to Division I schools vis-à-vis junior colleges when the institutions are recruiting

10

Case 3:25-cv-00062-CEA-DCP   Document 27   Filed 03/03/25   Page 10 of 19
PageID #: 493

prospective athletes. [Doc. 17 at 13]. Because athletes' time at junior colleges counts against their Division I eligibility, Plaintiff contends that junior colleges face difficulties when competing against Division I schools for athletes. [*Id.*]. The problem for Plaintiff is that he defines the relevant market as the market for Division I athletics, and junior colleges are not part of this market. Indeed, junior colleges are governed by the NCJAA, a separate entity that has no affiliation with the NCAA or Division I athletics. [Doc. 20-1 at ¶ 11–12]. The rule of reason requires Plaintiff to demonstrate substantial anticompetitive effects within the relevant market—Division I athletics—so it is axiomatic that purported harms to actors outside this market, such as junior colleges, cannot factor into the Court's analysis.

Junior colleges, to be sure, compete against Division I schools for athletes. In that sense, perhaps one could argue that junior colleges are participants in the market for Division I athletics, and harms to them could be relevant to assessing the JUCO Rule's anticompetitive effects. Even so, Plaintiff encounters the same issue as before: many reasons independent of the JUCO Rule could create substantial disadvantages for junior colleges when they compete against Division I schools in recruitment. Improved exposure, heightened competition, and greater NIL opportunities, individually, or taken together, provide athletes with independent incentives to opt for a Division I school over a junior college. To conclude after only a "quick look" that the JUCO Rule causes disparities in recruiting for junior colleges would be problematic, particularly when Division I institutions possess numerous built-in advantages that may account for the junior colleges' disadvantages. Disentangling these potential causes requires a more developed record that is simply not present in this exceedingly early stage of litigation.

Plaintiff's final theory of substantial anticompetitive effects focuses on the JUCO Rule's harm to consumers. According to Plaintiff, the JUCO Rule, in preventing former JUCO athletes

11

from playing four full seasons of Division I competition, renders the Division I teams they transfer to less competitive, which in turn harms consumers of college athletics. [Doc. 17 at 14]. The *Pavia* court reached this conclusion when analyzing the JUCO Rule, and the *Ohio* court found similar anticompetitive effects when considering the NCAA's rule that required athletes to sit out for one year after transferring schools. *Pavia*, 2024 WL 5159888, at *9 (explaining that the JUCO Rule causes "downstream effects for consumers of collegiate athletics" because it "harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level"); *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 594 (N.D.W. Va. 2023) (holding that the "value of the product that the NCAA provides to consumers is diminished when student-athletes are prevented from competing because of the Transfer Eligibility Rule"). The Court is not convinced any purported effects the JUCO Rule has on consumers "so obviously" evince a substantial anticompetitive effect that is discernible after only a "quick look." The Sixth Circuit, after all, refused to invalidate an Ontario Hockey League rule that prevented its teams from signing 20-year-old United States college hockey players. *National Hockey League Players' Ass'n*, 325 F.3d at 714–15. The rule does not create an economic injury to the market, the Sixth Circuit held, because it "merely substitutes one arguably less skilled player for another arguably more skilled player." *Id.* at 720.

The same is arguably true here. A former JUCO athlete who cannot play based on the JUCO Rule may be replaced with a "less skilled" athlete, such as an incoming freshman. But how can one say that this situation will necessarily cause downstream harms to consumers? Junior colleges are indisputably not the only source of talented athletes. Some incoming freshman, or even a Division I athlete in the transfer portal, may be more skilled than the junior college athlete whose eligibility expires due to the JUCO Rule. The Court lacks sufficient evidence in the current

12

record to suggest that the JUCO Rule diminishes consumers' welfare and enjoyment of college sports. Thus, Plaintiff's consumer welfare theory, just like his theories regarding harm to athletes and junior colleges, proves insufficient for the Court to conclude after a "quick look" that the JUCO Rule produces substantial anticompetitive effects.

But the Court has only discussed Plaintiff's arguments thus far. The Court has not touched on Defendant's. Like Plaintiff, Defendant retained an economic expert, Dr. Charles Murry. [Doc. 20-2]. Dr. Murry opines that the JUCO Rule does not result in substantial anticompetitive effects. Instead, the rule results in a neutral effect on the market; an athlete like Plaintiff who is ineligible under the JUCO Rule is replaced with an eligible athlete. [*Id.* at ¶ 16]; *see also National Hockey League Players' Ass'n*, 325 F.3d at 720. This phenomenon is hardly anticompetitive, Dr. Murry explains, but rather is "consistent with a competitive environment" insofar as the lost opportunity to the ineligible athlete results in an opportunity gained by another athlete. [*Id.*]. This argument, as with the arguments Plaintiff advances, is not immune from criticism. As Dr. Maxcy explains, he disagrees and feels that the JUCO Rule creates "significant welfare losses given inefficiencies put upon the full labor market." [Doc. 21-1 at ¶ 27]. These disagreements among economists, however, only underscore the difficulty in discerning the JUCO Rule's anticompetitive effects, if any, and the inappropriateness of "quick look" review at this stage of litigation.

Defendant advances another reason, one that is perhaps more persuasive, as to why the JUCO Rule is not anticompetitive. The JUCO Rule, Defendant posits, restricts the supply of athletes, which increases competition among institutions—Division I and junior colleges alike— and drives up compensation for athletes. [Doc. 20 at 16]. The *Arbolida* court made this very observation to conclude that the plaintiff was unlikely to succeed on his challenge to the JUCO Rule. *Arbolida*, Doc. 15 at 7 (explaining that the NCAA's eligibility rules, in limiting the supply

13

of athletes, "seem to increase competition among NCAA member institutions (along with other institutions such as JUCOs) for the limited supply of potential labor, thereby driving up the potential compensation for labor market participants").

Recall that it is Plaintiff's burden to demonstrate a strong likelihood of success on the merits to obtain a preliminary injunction. This burden is "much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). But Plaintiff "is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, LLC. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Thus, Plaintiff must do more than create a jury question, but he need not conclusively establish success on the merits. The Court has little doubt that Plaintiff has created a factual dispute as to whether the JUCO Rule results in substantial anticompetitive effects. But that is not enough. Plaintiff's arguments and his economist certainly paint a picture casting the JUCO Rule as anticompetitive, but Defendant's arguments and economist tell a different story.

The Court, to be sure, finds merit in aspects of both parties' arguments. That the Court feels this way suggests it would be inappropriate to invalidate the JUCO Rule after just a "quick look," which is what Plaintiff requests. Again, "quick look" review is only appropriate for challenged restraints that "so obviously" harm competition such that they can be easily condemned. *Alston*, 594 U.S. at 89. The Court is not satisfied that the largely undeveloped record in this case supports that accelerated mode of analysis. Instead, like most inquires under the rule of reason, the Court will need to "conduct a fact-specific assessment of market power and market structure" to determine the JUCO Rule's substantial anticompetitive effects, if they exist. *Id.* at 81.

None of this is to say Plaintiff cannot ultimately succeed on the merits. He may can. If he eventually does prevail, he would join a small group of antitrust plaintiffs. An estimated 90% of rule of reason cases over the last 45 years have been dismissed "on the ground that the plaintiff failed to show a substantial anticompetitive effect." *Alston*, 594 U.S. at 97 (citation omitted). The plaintiffs in *Alston* bucked that trend, but only after the district court gleaned evidence of substantial anticompetitive effects from a "voluminous record." *Id.* at 97–98. This case has not reached that stage. Until it does, or at least until the record undergoes some further development, the Court cannot conclude that the JUCO Rule produces substantial anticompetitive effects, particularly after a mere "quick look."

This holding means that the Court need not address steps two and three of the rule of reason analysis. Nevertheless, it goes without saying that the first step—proof of substantial anticompetitive effects—likely presents the highest hurdle for Plaintiff to clear. Other courts have noted, when analyzing the rule of reason's second step, that the NCAA's procompetitive justifications for its rules often ring hollow. *See, e.g.*, *Pavia*, 2024 WL 5159888, at *10–12. As one example, the NCAA insists that its eligibility rules ensure that student-athletes follow a standard four-year degree progression, yet the NCAA places no limits on how many times a student-athlete may transfer schools. *Id.* at *12. Unlimited transferring cannot possibly align with the NCAA's stated goals of promoting academic continuity and standard degree progression. These are issues for another day, however, and the Court will address them when the need arises.

C. State Law Claims

In addition to his Sherman Act claim, Plaintiff asserts claims for breach of contract and tortious interference with business relationships. [Doc. 1 at ¶ 67–90]. Plaintiff devotes a single paragraph in his opening brief to these state law claims. [Doc. 17 at 25]. His theory of liability is

15

Case 3:25-cv-00062-CEA-DCP  Document 27  Filed 03/03/25  Page 15 of 19
PageID #: 498

twofold. First, in enforcing an illegal bylaw against him, Defendant breached its contractual obligations under its bylaws and tortiously interfered with his and UT's business relationship. [*Id.*]. This argument necessarily fails. The Court already held that Plaintiff has not carried his burden to show that the JUCO Rule violates the Sherman Act, so its alleged illegality—particularly when it has not been declared illegal—cannot form the basis of Plaintiff's separate claims for breach of contract and tortious interference with business relationships.

That leaves Plaintiff's second theory. He contends that Defendant violated its contractual obligations through its failure to timely review his waiver request and refusal to include him as part of the Blanket Waiver. [*Id.*]. These arbitrary actions, Plaintiff argues, contravene Defendant's contractual obligations under its bylaws, which Plaintiff agrees to follow in exchange for his participation in Division I athletics. Some of these contractual obligations include Defendant's stated commitment to promoting "fair competition." [*Id.*].

At the outset, the Court doubts whether it possesses the authority to intervene in the NCAA's waiver process and compel the organization to reach a particular result when processing Plaintiff's application. The Court also doubts how Defendant breaches its contractual obligations or tortiously interferes with business relationships when it chooses to enforce a bylaw that the Court has declined to invalidate. If the bylaws represent Plaintiff and Defendant's contract, then surely Defendant's enforcement of the bylaws does not amount to breach of contract or tortious interference with business relationships. And while Plaintiff may find his exclusion from the Blanket Waiver frustrating, "the NCAA has the authority to issue a waiver that begins on a certain date." *Goldstein*, Doc. 26 at 16 n.11.

Plaintiff seeks injunctive relief on his state law claims, which, at least in the context of his contract claim, essentially amounts to a request for specific performance. Courts often award

specific performance upon breach of a land sales contract, the theory being that every parcel is unique, and the buyer should receive the specific parcel he was promised. *Hillard v. Franklin*, 41 S.W.3d 106, 111 (Tenn. Ct. App. 2000). Specific performance is only available, however, when the contract contains definite terms, meaning its language enables courts to readily determine each party's rights and obligations. *GRW Ents., Inc. v. Davis*, 797 S.W.2d 606, 614 (Tenn. Ct. App. 1990). Land sales contracts will typically satisfy this standard insofar as they identify the particular parcel to be sold. The Court does not see how the general promises Plaintiff identifies in the bylaws impose a definite obligation on Defendant to grant Plaintiff eligibility in the way a typical land sales contract obligates the seller to part ways with a particular parcel. That the bylaws generally obligate Defendant to promote "fair competition," for example, does not mean Defendant must excuse Plaintiff from the JUCO Rule. Plaintiff's state law claims received minimal attention both in the briefing and at the preliminary injunction hearing, but the Court nonetheless concludes that Plaintiff has not established a strong likelihood of success on the merits.

### D. Remaining Preliminary Injunction Factors

Plaintiff's likelihood of success on the merits is not the only factor relevant to his request for a preliminary injunction. Courts also balance whether the movant would suffer irreparable harm absent an injunction, whether an injunction would cause substantial harm to others, and whether an injunction would serve the public interest. *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 763 (6th Cir. 2019). The district court "is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are dispositive of the issue." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citation and internal quotation marks omitted). Though Plaintiff's failure to show a strong likelihood of success proves fatal to his request for a preliminary

injunction, it remains useful for district courts to analyze all four of the relevant factors. *Id.* The Court will touch briefly on each remaining factor below.

First, consider irreparable harm. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Id.* at 550 (quoting *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). Other courts have concluded that denial of the opportunity to play sports constitutes irreparable harm. *See, e.g.*, *Ohio*, 706 F. Supp. 3d at 597; *but see Goldstein*, Doc. 26 at 15–16 n.11 (explaining that because the plaintiff "has not had any remaining eligibility for more than eight months, that same lack of eligibility cannot now meet the irreparable harm requirement for the issuance of a preliminary injunction"). The Court is inclined to agree that lost opportunities to play sports result in irreparable harm; monetary damages likely cannot fully compensate an athlete's chance to take the field and build his brand.

Next is the consideration of whether an injunction, if issued, "would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, LLC*, 511 F.3d at 550–51 (quoting *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). The Court does not see how granting eligibility to one athlete among the many thousands who compete would result in substantial harm to the NCAA. Nor does the Court detect any harm to third parties that would result following the issuance of an injunction. *Id.* at 551. It's not as if a player on UT's roster would lose his spot on the team if Plaintiff were declared eligible. Lastly, the Court considers whether an injunction would serve the public interest. *Id.* Plaintiff contends that an injunction would advance the public's interest in promoting fair competition. [Doc. 17 at 24]. The Court already concluded that Plaintiff has not demonstrated a substantial likelihood of success on his Sherman Act claim, however, so this argument is inapposite and renders this factor neutral at best.

## IV. CONCLUSION

The Court is sympathetic to Plaintiff's position. For an organization that professes to prioritize the well-being of its student-athletes, the NCAA's conduct has in many ways been questionable at best and self-interested at worst. Still, Plaintiff's extraordinary talents cannot alone justify the extraordinary remedy he seeks. Because Plaintiff fails to show a strong likelihood of success on his claims under the Sherman Act and state law, his Motion for Preliminary Injunction [Doc. 2] is **DENIED**.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**